Pamela PECK, Plaintiff and Appellant,

v.

William DUNN, Pete Kutulas, and William Hutchinson, as Members of the Board of County Commissioners of Salt Lake County, Defendants and Respondents.

No. 15338.

Supreme Court of Utah.

Jan. 13, 1978.

Robert Van Sciver, Randall T. Geither, Salt Lake City, for plaintiff and appellant.

R. Paul Van Dam, Salt Lake County Atty., Donald Sawaya, Marcus G. Theodore, Deputy Salt Lake County Attys., Salt Lake City, for defendants and respondents.

1. The County Commission, acting in its legislative function.

**CROCKETT, Justice:**

Plaintiff, Pamela Peck, was charged with the offense of cruelty to animals, in violation of Title 16, Chapter 3, Section 28, Revised Ordinances of Salt Lake County, in that "at Peck Farm, at 8:50 p. m. on the 8th day of January, 1977 . . . [she did] keep or use an animal . . . to wit: a game cock, for the purpose of fighting . . or [that she] was a party to or present as a spectator at such fighting . . . ."

In order to arrest that prosecution, she brought this action against the County Commission seeking a declaratory judgment that the ordinance is unconstitutional on the grounds: (1) that it is vague and uncertain in that innocent conduct of merely being a spectator could be included within its language; and (2) that presence at such a cock fight is proscribed, without requiring a culpable mental state. The trial court rejected her contentions and she appeals.

It is elementary that the governing authority[1] in the exercise of its police power has both the prerogative and the responsibility of enacting laws which will promote and conserve the health, safety, morals and general welfare of society. The question is whether this ordinance is properly regarded as regulatory of morals. What constitutes morals is whatever conduct, customs and attitudes are generally accepted and approved at the time in the particular culture. It is therefore essential to consider whether cock fighting can be regarded as merely an innocent diversion, as plaintiff's argument seems to suggest, or is itself an evil which may be condemned by law.

In former times the provoking and baiting of animals to fight each other for the amusement of spectators was a diversion to be accepted, or at least tolerated.[2] Indeed in yet earlier times the pitting of human beings against each other as gladiators, or against animals, was similarly viewed; and even today the fighting of animals is so

2. *State v. Buford,* 65 N.M. 51, 331 P.2d 1110, 82 A.L.R.2d 787 (1958); *State ex rel. Miller v. Claiborne,* 211 Kan. 264, 505 P.2d 732 (1973).

accepted in some parts of the world. Over the centuries the disposition to look upon such brutalities with favor or approval has gradually lessened, and compassion and concern for man's fellow creatures of the earth has increased to the extent that it is now quite generally thought that the witnessing of animals fighting, injuring and perhaps killing one another is a cruel and barbarous practice, discordant to man's better instincts and so offensive to his finer sensibilities that it is demeaning to morals.[3]

■ Whatever one's personal views may be of such matters, the legislative authority of our state has determined as a matter of public policy that such conduct is so involved in public morals and welfare that it has made cruelty to animals a crime and included therein the causing of one animal to fight with another.[4] There is no question but that a cock is an animal; and the county ordinance in question specifically so indicates by its express prohibition of the causing animals, including any fowl, to fight.[5] The county ordinance in question is in harmony with and does not extend the concept determined as the public policy of our state by the statute referred to. In consequence of what we have said above, we are in agreement with the expression of respected authorities that legislation against such practices as the fighting of animals is justified for the purpose of regulating morals and promoting the good order and general welfare of society.[6]

■ Plaintiff's further argument is that under the literal wording of the ordinance, an innocent passing by onlooker could be found guilty. Perhaps we should appreciate her concern for an innocent person caught in such a predicament. Indeed we would; and we think that any reasoning law enforcement officer, prosecutor, judge or jury would, if such were the facts. But it does not appear that they are the facts here. In regard to plaintiff's contention, these things are to be said generally about the interpretation and application of a statute or ordinance: it is not our duty to indulge in conjecture that the statute may be so distorted or unreasonably applied that some innocent person might come within its terms. Rather, it is our duty to assume that those who administer a statute will do so with reason and common sense, in accordance with its language and intent; and further, that if there is a choice as to the matter of its interpretation and application, that should be done in a manner which will make it constitutional, as opposed to one which would make it invalid.

■ What has just been said also bears on plaintiff's other argument: that the ordinance denounces conduct without requiring a culpable mental state. We recognize, of course, that most crimes require a criminal intent in the doing of the act prohibited. Some require only a general intent to do an act, which is evil in itself. Examples are acts like murder, rape, kidnapping, which are said to be malum in se. In such circumstances, a person is presumed to intend the natural consequences of his act[7] and the general criminal intent with which an act

3. See a good expression on this subject by Justice Steele, in *Bland v. People*, 32 Colo. 319, 76 P. 359 (1904). In commentary on such moral standards George B. Shaw writes: "When a man shoots a tiger to murder him, he calls it sport, but when a tiger attacks a man, he calls it a savage beast."

4. U.C.A.1953, Sec. 76–9–301: "(1) A person commits cruelty to animals if he . . . (f) Causes one animal to fight with another. . . ."

5. See *Oregon Game Fowl Breeders Assn. v. Smith*, 15 Or.App. 487, 516 P.2d 499 (1974),

where the court held that cockfighting was prohibited by a statute proscribing cruelty to animals because the statute specifically included birds in the category of animals.

6. That cruelty to animals was indictable at common law as a misdemeanor and is a proper subject for regulation by statute or ordinance, see 3A C.J.S. Animals § 99. See also 16 C.J.S. Constitutional Law § 174 and numerous cases therein cited.

7. *State v. Peterson*, 22 Utah 2d 377, 453 P.2d 696 (1969).

was done may be inferred from the words and conduct of the actor.[8]

There are other crimes which require a specific intent. In them the prosecution must prove the intent with which the act was done.[9] For example, the elements of the crime of burglary are: (1) the act of entering a building, and (2) the specific intent to commit a "felony, theft or assault" therein.[10] The entering of a building is not inherently evil, and that act alone does not give rise to a presumption or an inference that the actor entered with the requisite intent to constitute burglary. In addition to the entry, the intent to commit a "felony, theft or assault" therein must be proved, or circumstances shown from which the intent may reasonably be inferred.[11]

In addition to the classes of crimes just discussed, which require proof of intent, there is another class of crimes in which the doing of an act is prohibited by law and the doing of the act itself constitutes the crime, without regard to the intent with which it is done. They are spoken of as malum prohibitum, and are sometimes referred to as crimes of strict liability, or absolute responsibility. Examples of these are traffic regulations such as prohibiting driving through red lights, stop signs, or at excessive speeds, the carrying of loaded firearms in certain places and circumstances,[12] the carrying of concealed weapons,[13] or unauthorized possession of narcotics. With respect to this class of crimes, the only criminal intent necessary is implicit in the willful doing of the prohibited act.

Applying the principles above stated to the plaintiff's contentions, it will be seen that a sensible and practical application of the ordinance would require a person to be present as a spectator in the sense of one purposefully and intentionally attending and observing such a fight, as opposed to some mere passerby happening to so observe it. If the ordinance is thus looked at and applied in what we have stated to be a sensible and practical way, we see no justification for declaring it unconstitutional.[14] This conclusion is reinforced by the doctrine of constitutional law that the courts should defer to the legislative prerogative and should presume such enactments to be valid and should not strike down legislation unless it clearly and persuasively appears that the act is in conflict with a constitutional provision.[15]

Affirmed. No costs awarded.

ELLETT, C. J., and MAUGHAN, WILKINS and HALL, JJ., concur.

---

8. 22 C.J.S. Criminal Law § 33.

9. 22 C.J.S. Criminal Law § 32.

10. U.C.A.1953, Sec. 76–6–202.

11. *State v. Clements*, 26 Utah 2d 298, 488 P.2d 1044 (1971); *State v. Jamison*, 110 Ariz. 245, 517 P.2d 1241 (1974).

12. U.C.A.1953, Sec. 76–10–505.

13. U.C.A.1953, Sec. 76–10–504.

14. We decide as herein indicated in awareness of *State v. Abellano*, 50 Hawaii 384, 441 P.2d

333 (1969), relied upon by the plaintiff which decided that the statute which condemned merely being "present" at a cockfight was unconstitutional because it might encompass innocent conduct.

15. *In the Matter of the Estate of Baer*, Utah, 562 P.2d 614 (1977); *Branch v. Salt Lake County Service Area No. 2*, 23 Utah 2d 181, 460 P.2d 814 (1969); *Gord v. Salt Lake City*, 20 Utah 2d 138, 434 P.2d 449; 16 C.J.S. Constitutional Law § 99.